NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 84

No. 2018-102

| | |
|---|---|
| In re Laberge Shooting Range | Supreme Court |
| (Firing Range Neighborhood Group, LLC, Appellant) | |
| | On Appeal from |
| | Superior Court, |
| | Environmental Division |
| | |
| | June Term, 2018 |

Thomas G. Walsh, J.

Justin B. Barnard and Austin D. Hart of Dinse, Knapp & McAndrew, P.C., Burlington, for
 Appellant.

Hans G. Huessy of MSK Attorneys, Burlington, for Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **SKOGLUND, J.** The Firing Range Neighborhood Group, LLC (Neighborhood Group) appeals an environmental court decision declining to find Act 250 jurisdiction over a firing range operated by the Laberge family (Laberge). Neighborhood Group argues that the environmental court erred by: (1) allowing Laberge's untimely appeal; (2) concluding that because Laberge did not rely on donations, it was not operating for a commercial purpose; and (3) granting preclusive effect to a 1995 jurisdictional opinion. We affirm.

¶ 2. The Laberge family owns and operates a 287-acre farm, of which ten acres have been used as a shooting range since the 1950s by Laberge and the public. Elder members of the Laberge family have used the range since childhood, when they competed in marksmanship at a

national level, though they currently shoot at the range as little as two-to-three times per year. The family often frequents the range to oversee its use. Over the years, Laberge has accepted occasional donations of scrap lumber and some users have voluntarily provided services such as construction or repair of shooting benches.

¶ 3.    In 1994, a group of neighbors requested an advisory opinion from the District Environmental Coordinator (Coordinator) regarding the range's potential status under Act 250. The requestors claimed the range had been converted "from a family focus, to commercial activity," evidenced by the presence of a donation box, as well as an increase in noise and use by law enforcement agencies. Laberge responded with a letter to the Coordinator, noting that Laberge had never charged anyone for use of the range, and that the donation box was a "temporary measure" started in 1992 to defray legal fees associated with the range. On April 14, 1995, the State of Vermont District Environmental Commission (Commission) issued a "Jurisdictional Opinion" (1995 JO) and served it to various interested parties. The 1995 JO found preexisting improvements but "no evidence that the use of the shooting range was or has ever been associated with the payment of a purchase price, fee, contribution, donation, or other object having value." Because the use of the range was always by permission only and no fees were ever charged for personal use, for training purposes, or for competitions, the Commission found no basis for concluding the "the use of the range meets the definition of commercial purpose." Thus, the 1995 JO concluded that range did not require an Act 250 permit.

¶ 4.    In 2012, at the recommendation of the Vermont Fish and Wildlife Department, Laberge installed several small earthen berms behind the target frames to reduce the risk of ricochets. A range user also made unsolicited repairs to several deteriorating shooting benches to improve their safety and functionality.

¶ 5.    By 2015, the University of Vermont Shooting Team, the Chittenden County Sheriff's Department, the Williston Police Department, and other law enforcement departments in

2

the area used the range for training purposes. There is a box with a hand-painted "DONATE HERE" sign at the entrance to the range. Some of these organizations have donated to the range, which took in over $47,000 in contributions from May 2014 through November 2016. Laberge has used these funds to pay legal fees and occasional maintenance for the range. On occasion, some funds were used to pay taxes and insurance on the farm, but the environmental court below found it was unclear what portion of the farm's property taxes and insurance were paid with donation money or how frequently this had been done.

¶ 6. In November 2015, the recently formed Neighborhood Group requested a new jurisdictional opinion from the Commission. Neighborhood Group argued that since 1995, the range had begun operating with a "commercial purpose," citing the continued acceptance of donations and the 2012 berm placements and bench repairs. Members complained of a sharp increase in the volume, intensity, and hours of shooting noise over recent years. In February 2016, the Commission issued a jurisdictional opinion (2016 JO), finding that, due to regular donations from municipalities, the range was now operating for a commercial purpose such that the construction of berms and shooting benches subjected the range to Act 250 jurisdiction.

¶ 7. At Laberge's request, the Natural Resources Board (NRB) reconsidered the 2016 JO, which it upheld in a decision issued on July 19, 2016. On August 2, 2016, the NRB issued an "altered" decision, correcting only a typographical error in the title: from "In Re: Jurisdictional Opinion 2-247 Laberge Shooting Range" to "In re: Jurisdictional Opinion 4-247-Altered Laberge Shooting Range." Both decisions contained the same language stating that "[a]ny appeal of this decision must be filed within 30 days of the date the decision was issued."

¶ 8. Laberge's then-counsel advised Laberge that the deadline to appeal was September 2, 2016, thirty days from the issuance of the altered reconsideration decision. Representatives for Laberge met with the District Coordinator who informed them that the deadline to appeal was September 2, 2016. On August 22, counsel for Neighborhood Group contacted Laberge's former

3

counsel and informed it that the appeal deadline had passed. On August 26, Laberge, represented by new counsel, appealed the altered decision to the Environmental Division of the Superior Court. Neighborhood Group moved to strike the notice of appeal as untimely on September 2. On September 19, Laberge submitted both a memorandum in opposition to the motion to strike, and a motion to allow an untimely appeal on the basis of excusable neglect, good cause, or the prevention of manifest injustice.

¶ 9.  The environmental court granted Laberge's motion to allow an untimely appeal, concluding that the erroneous advice of Laberge's former counsel and the representation of the District Coordinator that the appeal period ran from the date of the altered decision, together with the plain language in the altered decision stating that the appeal period ran for thirty days from the date it was issued, supported a finding of excusable neglect.

¶ 10.  Both parties filed motions for summary judgment. Neighborhood Group argued that since the 1990s, Laberge had begun operating the range for a commercial purpose, due to the solicitation of donations and the high proportion of use by third parties. Neighborhood Group also argued that the construction of berms and shooting benches in 2012 constituted improvements that triggered Act 250 jurisdiction. Laberge argued that the range was a preexisting development and that the improvements were exempted as routine repair, de minimus, or for safety and environmental risk mitigation purposes.

¶ 11.  The environmental court denied both summary judgment motions, citing material disputes as to whether there had been sufficient changes in operation of the range since the 1995 JO to constitute a commercial purpose. The parties stipulated to an abbreviated trial to determine whether Laberge's acceptance of donations constituted a change in use and whether nonexempt improvements had been made to the range in 2012. At trial, the environmental court found that Laberge had never required payment for use of the range, and that Laberge would continue to make the range available for use even without donations. Thus, the environmental court declined

4

to impose Act 250 jurisdiction, finding that Neighborhood Group had "fail[ed] to meet its burden of proof showing that cash donations are necessary for the [r]ange to operate" or that "there has been a change in donations to the [r]ange since the 1995 JO was issued that would create a commercial purpose where none existed before."

¶ 12. On appeal, Neighborhood Group argues that the environmental court erred by: (1) allowing Laberge's untimely appeal; (2) concluding that because Laberge did not rely on donations, it was not operating for a commercial purpose; and (3) granting preclusive effect to the 1995 JO.

¶ 13. Neighborhood Group first argues that the environmental court erred in allowing Laberge's untimely appeal. We review decisions to allow untimely appeals based on excusable neglect for an abuse of discretion. State v. Felix, 153 Vt. 170, 171, 569 A.2d 493, 494 (1989). "An abuse of discretion will be found only when the trial court has entirely withheld its discretion or where the exercise of its discretion was for clearly untenable reasons or to an extent that is clearly untenable." Vt. Nat'l Bank v. Clark, 156 Vt. 143, 147, 588 A.2d 621, 623 (1991) (quotation omitted). The Vermont Rules for Environmental Court Proceedings state that a notice of appeal must be filed "within 30 days of the date of the act, decision, or jurisdictional opinion appealed from, unless the court extends the time as provided in Rule 4 of the Vermont Rules of Appellate Procedure." V.R.E.C.P. 5(b)(1). Rule 4 of the Vermont Rules of Appellate Procedure, in turn, allows a court to "extend the time for filing the notice of appeal if: (A) the relief is requested by motion filed no later than 30 days after the expiration of the time prescribed by Rule 4(a); and (B) the party shows excusable neglect or good cause." V.R.A.P. 4(d)(1).

¶ 14. In determining whether excusable neglect exists, we consider " 'the danger of prejudice to the [nonmovant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.' " In re Town of Killington, 2003 VT

87A, ¶ 16, 176 Vt. 60, 838 A.2d 98 (alteration in original) (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993)). Furthermore, "the appropriate focus is on the third factor: the reason for delay, including whether it was within the reasonable control of the movant." Id.

¶ 15. Neighborhood Group's argument only addresses the third element, claiming that Laberge has not provided a sufficient reason for the delay, which was within its control. We have held the "excusable neglect standard [to be] a strict one." Felix, 153 Vt. at 171, 569 A.2d at 494. Though erroneous advice from counsel alone does not usually satisfy the excusable neglect standard, the environmental court was within its discretion to find that the consistent advice given by the Coordinator who authored the 2016 JO, combined with the ambiguous language printed on the altered reconsideration decision stating that "[a]ny appeal of this decision must be filed within 30 days of the date the decision was issued," weighed in favor of Laberge. (Emphasis added).

¶ 16. Neighborhood Group complains that, despite notifying Laberge's former counsel that the deadline had passed, Laberge did not move to allow an untimely appeal until twenty-eight days later, the last day to do so. However, Neighborhood Group makes no showing that this Court has ever accepted the idea that a lower court abuses its discretion by accepting a motion to allow an untimely appeal at the last minute. We decline the invitation to do so now. Therefore, we find that the environmental court was well within its discretion by allowing Laberge's appeal and turn to Neighborhood Group's substantive arguments.

¶ 17. Neighborhood Group next argues that the environmental court erred by failing to conclude that Laberge is operating for a commercial purpose within the meaning of Act 250. We review issues of law and statutory interpretation "de novo, allowing us to proceed with a nondeferential, on-the-record review." In re Vill. Assocs. Act 250 Land Use Permit, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712 (quotation omitted).

6

¶ 18.   To be a "development" subject to jurisdiction under Act 250, there must be "[t]he construction of improvements on a tract or tracts of land, owned or controlled by a person, involving more than 10 acres of land within a radius of five miles of any point on any involved land, <u>for commercial or industrial purposes</u>."  10 V.S.A. § 6001(3)(A)(i) (emphasis added).  Act 250 Environmental Board Rules define "commercial purpose," as used in 10 V.S.A. § 6001(3), as "the provision of facilities, goods or services by a person other than for a municipal or state purpose to others <u>in exchange for</u> payment of a purchase price, fee, contribution, donation or other object or service having value."   Act 250 Rule 2(C)(4), Code of Vt. Rules 12 004 060, https://www.lexisnexis.com/hottopics/codeofvtrules (emphasis added).  Because these "rules were ratified by the Legislature in 1985 . . . they have the same force and effect as any other law passed by the Legislature."  <u>In re Spring Brook Farm Found., Inc.</u>, 164 Vt. 282, 285, 671 A.2d 315, 317 (1995).

¶ 19.   This Court has held that a mandatory fee-for-service model is not necessary to satisfy the "in exchange for" element of Rule 2(C)(4).  <u>In re Baptist Fellowship of Randolph, Inc.</u>, 144 Vt. 636, 639, 481 A.2d 1274, 1276 (1984).  At issue in <u>Baptist Fellowship</u> was whether the Church's construction of a meeting house was a development under Act 250.  The Church argued that the phrase "in exchange for" in the statute imposed a requirement "that the facility be available only to those who, wishing to use the facility, pay to the Church a 'purchase price, fee, contribution, donation or other object having value.' "   <u>Id</u>.   The lower court found that the Church's interpretation would render the terms " 'contribution' " and " 'donation' " in the rule superfluous. <u>Id</u>.  It further noted that the majority of the Church's income was derived from the contributions and donations of its members and held "[w]hile there is no quid pro quo exchange involved, it is clear that the Church could not provide the facilities and services to its members unless it received the contributions and donations from its members."  <u>Id</u>.  On appeal this Court affirmed, holding

that there was a de facto exchange of the church's facilities and services for donations and contributions. Id. That is not the case here.

¶ 20. This Court again addressed the presence of a commercial purpose in the absence of a fee requirement in the Spring Brook Farm case, where a charitable foundation purchased a farm with the intent to establish a program that would provide underprivileged children with a residential educational experience in a rural agricultural setting. Spring Brook Farm, 164 Vt. at 283-84, 671 A.2d at 316. The foundation—which received most of its initial funding from the owners of a major corporation—planned to construct a classroom/residence hall using existing funds, while intending the farm to eventually support itself by soliciting donations from the general public and the business community. The central issue in the case was whether a direct exchange between a provider and recipient of services was required to satisfy a finding that the project was for a commercial purpose. Id. at 285, 671 A.2d at 317-18.

¶ 21. In reaching our holding that the farm was under Act 250 jurisdiction, this Court offered several supporting propositions. We reiterated Baptist Fellowship's understanding that neither a quid pro quo funding model nor a for-profit status is necessarily required for Act 250 jurisdiction. Id. at 286-87, 671 A.2d at 318. We rejected the argument that it is "necessary that the person providing the payment be the person who receives the benefit from the facility or service." Id. at 288, 671 A.2d at 317. Thus, the proposed development at issue met the exchange element of a commercial purpose even though the children who would be using the service would not be the donors. We went on to say that "[t]he crucial element of the commercial purpose test for determining Act 250 jurisdiction is whether the developer provides goods or facilities to others in exchange for something of value." Id. We also discussed the purpose of Act 250 at some length, suggesting that the "exchange" element was "intended to separate development for use by others from development for personal use." Id. at 287, 671 A.2d at 318.

8

¶ 22.     Neighborhood Group claims that Baptist Fellowship stands for the proposition that Act 250 jurisdictional requirements only (1) speak to "land use, not the nature of the institutional activity," and (2) extend to organizations that do not require mandatory individual payments from users, while minimizing the role of any de facto exchange analysis. Id. Neighborhood Group further asserts that Spring Brook Farm's understanding of the overall purpose of the Act mandates a broad interpretation of the commercial purpose test to require only "that the developer get something of value in exchange for providing the facilities, goods or services." Id.

¶ 23.     Such reasoning overlooks the key point from Baptist Fellowship, while attempting to draw too much from the rather expansive discussion abutting Spring Brook Farm's narrow holding. In Baptist Fellowship, the trial court found that the church, which required no individual parishioner to contribute, did require the congregation to provide contributions and/or donations for the Church to function. Baptist Fellowship, 144 Vt. at 639, 481 A.2d at 1276. Thus, the central holding of Baptist Fellowship is that an organization that does not use a quid pro quo model may still be under Act 250 jurisdiction if the developer relies on contributions or donations to provide the service. Id.

¶ 24.     Spring Brook Farm then narrowly decided the issue of whether the donor must also be the recipient of the service provided to satisfy the exchange element of the commercial purpose test, leaving the central tenet of Baptist Fellowship undisturbed. Spring Brook Farm, 164 Vt. at 287, 671 A.2d at 319. We held that the presence of a third-party donor does not inherently undermine the logic of a de facto exchange. "[I]t is irrelevant whether the payment comes from the beneficiary of the facilities, goods or services or from a third party." Id. Regardless of the source, contributions will satisfy the de facto exchange analysis for the commercial purposes requirement if the organization relies on them to provide the service.

¶ 25.     The language of the three-justice majority opinion in Spring Brook Farm did not dilute the de facto exchange test. By stating that a commercial purpose requires only "that the

9

developer get something of value <u>in exchange for</u> providing . . . services," this Court merely paraphrased Rule 2(C)(4)'s definition of a commercial purpose. <u>Id</u>. (emphasis added); Act 250 Rule 2(C)(4) (defining commercial purposes as "the provision of facilities, goods or services by a person other than for a municipal or state purpose to others <u>in exchange for</u> payment of a purchase price, fee, contribution, donation or other object or service having value" (emphasis added)). The <u>Spring Brook Farm</u> Court left undisturbed its prior interpretation of the critical phrase, "in exchange for," within the commercial purposes test. The conjecture that the purpose of Rule 2(C)(4) was to "separate development for use by others from development for personal use" was not essential to our holding and does not invert the plain language of the Rule. <u>Id</u>. at 287, 671 A.2d at 318. <u>Spring Brook Farm</u>'s holding is entirely consistent with the application of a de facto exchange analysis.

¶ 26. Neighborhood Group argues that because the foundation would have built the <u>Spring Brook Farm</u> facility with "existing resources" and only "intend[ed] to become self-supporting" through donations, the holding must implicitly repudiate the de facto exchange analysis. <u>Id</u>. at 284, 290, 671 A.2d at 317, 320. However, we held that a commercial purpose existed because "the [f]oundation <u>will provide</u> a facility to underprivileged children in exchange for donations and contributions." <u>Id</u>. at 288, 671 A.2d at 319 (emphasis added). Thus, this Court's ruling rested in part on the foundation's long-term plans to rely on community donations, satisfying the requirement for a de facto exchange element of a commercial purpose. Furthermore, regardless of its intentions, it is unlikely that the <u>Spring Brook Farm</u> facility could long survive without income from some source, whether from the public or the charitable foundation—itself a product of donations by its benefactors. <u>Id</u>. at 284, 671 A.2d at 317. Thus, by finding that the continued provision of an educational service was dependent upon donations or contributions, <u>Spring Brook Farm</u>'s decision echoes our conclusion in <u>Baptist Fellowship</u> that a de facto exchange constitutes a commercial purpose under Act 250.

¶ 27. Neighborhood Group invites us to interpret the language of Rule 2(C)(4)'s commercial purpose definition broadly, to further what it sees as the far-reaching policy objectives of Act 250. See In re N. E. Materials Grp. LLC, 2015 VT 79, ¶ 26, 199 Vt. 577, 127 A.3d 926 ("[T]he focus of Act 250 is regulating the impacts of development . . . ."); Spring Brook Farm, 164 Vt. at 287, 671 A.2d at 318 ("The Act requires a focus on the impact of the land use, not the nature of the institutional activity." (citing Baptist Fellowship, 144 Vt. at 639, 481 A.2d at 1276)). Neighborhood Group, arguing that the de facto exchange analysis is irrelevant to land use and should therefore be abandoned, seems to suggest an alternative test that would find a commercial purpose within the meaning of Act 250 with the mere presence of contributions or regular use by multiple parties. We reject Neighborhood Group's interpretation as one that is contrary to the plain meaning of Act 250's text and is based on an incomplete understanding of the purpose of the statute.

¶ 28. Here, as in all instances of statutory construction, the "primary goal is to give effect to the legislative intent and . . . we first look to the plain meaning of the statute." Village Assocs., 2010 VT 42A, ¶ 9. Our primary indication of the intent of Act 250's drafters is that they explicitly chose to include language limiting Act 250 jurisdiction to only those improvements operated for a commercial purpose. 10 V.S.A § 6001(3)(A)(i). By limiting Act 250 jurisdiction to only those improvements on a tract of land greater than ten acres and to land use that has a commercial or industrial purpose, the Legislature specifically intended not to regulate all land use that has environmental impacts. In re Agency of Admin., 141 Vt. 68, 76, 444 A.2d 1349, 1352 (1982).

¶ 29. Finding a commercial purpose merely with use by the public and the presence of donations impermissibly lowers the standard set by the Act's text. Neither § 6001(3)(A)(i) nor Act 250 Rule 2(C)(4) inquire as to the proportion of public to private use. Likewise, Act 250 Rule 2(C)(4) does not simply ask whether services are provided while receiving donations. Instead, it requires that a commercial purpose meet a more exacting criterion, consisting of "the provision of

11

facilities, goods or services . . . to others in exchange for . . . [a] contribution, [or] donation." Act 250 Rule 2(C)(4) (emphasis added). Our de facto interpretation of an exchange in Baptist Fellowship remains faithful to the limitations imposed by the "commercial purpose" language of Act 250, while adequately accommodating Act 250 Rule 2(C)(4)'s expansion of the term to include some instances of payment via donation and contribution.[*] We see no need to depart from this understanding of an exchange in such a way as to nearly discard the "commercial purpose" from the text of the Act.

¶ 30. Neighborhood Group's interpretation of a commercial purpose also rests on an incomplete understanding of the purpose of the Act, namely that it only "requires a focus on the impact of the land use, not the nature of the institutional activity." Spring Brook Farm, 164 Vt. at 287, 671 A.2d at 318 (citing Baptist Fellowship, 144 Vt. at 639, 481 A.2d at 1276). That statement was not essential to our ruling in Spring Brook Farm and was made in the context of modest refinement of an Act 250 Rule 2(C)(4) exchange to include contributions by third-party donors. Likewise, the comment in Baptist Fellowship was made while rejecting an apparent argument that religious or "other nonprofit uses, such as hospitals, are so excluded" from Act 250 jurisdiction. Baptist Fellowship, 144 Vt. at 640, 481 A.2d at 1276. We do not extend this simplified view of Act 250's purpose beyond its intended bounds to virtually remove the "commercial purpose" from the text. While it should surprise no one that a land use Act "requires a focus on the impact of the land use," it does not follow that our general approximation was intended to render the financial

---

[*] To be clear, our de facto exchange analysis applies only to those organizations that do not charge users a fee for the goods or services provided. The reliance requirement arises from the reconciliation of Act 250 Rule 2(C)(4)'s ostensibly contradictory use of the words "contribution" and "donation," which are—by definition—voluntarily given without consideration, with an "exchange." Baptist Fellowship, 144 Vt. at 639, 481 A.2d at 1276. Any organization that requires the payment of a "purchase price, fee . . . or other object or service having value," by necessity or otherwise, clearly satisfies Act 250 Rule 2(C)(4)'s definition of a commercial purpose.

activity of the institution wholly irrelevant. Such a holding would be untrue to the Act, which clearly contains a "commercial purpose" as one of several requirements in the jurisdiction analysis.

¶ 31. A more thorough exploration of the purposes of Act 250 reveals complexity and compromise:

> [A]lthough the purposes of Act 250 are broad, the Legislature in passing the Act did not purport to reach all land use changes within the state . . . . The Act was a philosophic compromise between a desire to protect and control all the lands and environment of the state of Vermont, and the need to avoid an administrative nightmare.

In re Agency of Admin., 141 Vt. at 76, 444 A.2d at 1352 (1982) (citing Hearing on H.417, Senate Natural Resources Committee, March 16, 1970). Though the exact role of the commercial purpose delineation within this delicate compromise is inevitably the subject of some debate, we approach our understanding of it respectful of its place within an intricate balance.

¶ 32. Alternative understandings of the commercial purpose requirement's function within Act 250 abound. It has been argued that the commercial purpose requirement, rather than merely connoting use by multiple parties, was intended to capture those developments that are especially " 'big, concentrated and exhausting to the resources of the environment,' " demonstrating that a " 'greater need for supervision exists in the case of commercially motivated development where the dominant factor is the hope for profit.' " Spring Brook Farm, 164 Vt. at 291, 671 A.2d at 321 (Dooley, J., dissenting) (quoting In re Spring Valley Dev., 300 A.2d 736, 742 (Me. 1973) (interpreting similar commercial requirement for jurisdiction under analogous Maine land use act)). The Vermont Legislature may also have chosen the commercial purpose criterion to efficiently target its regulatory efforts while avoiding inflicting a costly permitting process upon small, community-based undertakings that might be viewed as generally more beneficial to a community, less impactful to the environment, and more easily stymied by the costs of permitting than their commercial counterparts. Regardless of where the exact contours of the

13

Act's true purposes lie, we will not ignore its complexities to reduce the commercial purpose criterion to the mere presence of donations or multi-party use.

¶ 33. Neighborhood Group argues that whether an organization relies on donations to provide a service—a de facto exchange—is an arbitrary jurisdictional requirement that is unrelated to land use impacts. However, this Court, after considering the text and purpose of Act 250, has twice applied Rule 2(C)(4) in a way that adequately reconciles language referencing an exchange with that of a contribution or donation. That the resulting de facto exchange interpretation may not always correlate perfectly with land use impacts does not merit reversing longstanding and otherwise sound reasoning now.

¶ 34. Laberge has never charged anyone for use of the range and its owners continue to take part in range activities. Neighborhood Group put forward no evidence to contradict testimony that Laberge would continue to make the range available for use even without donations. Neighborhood Group protests that this statement is self-serving and difficult to verify. However, the environmental court rightly pointed out that the extremely low cost of maintaining the range's minimal infrastructure lend credibility to the assertion, a finding which we will not disturb. Because Laberge did not charge a fee or rely on donations to provide use of the range, the environmental court properly concluded that the range did not operate for a commercial purpose and was therefore not under Act 250 jurisdiction.

¶ 35. Because we affirm that the range is not currently operating for a commercial purpose, its 1995 status is irrelevant. Therefore, we need not reach the question of whether the 1995 JO had preclusive effect. Likewise, we do not address the potential presence of "improvements" on the range.

¶ 36. The environmental court did not abuse its discretion in finding excusable neglect and allowing Laberge's untimely appeal. Neither did it err when it concluded that Laberge, which had never charged for the use of the range and did not rely on donations for its operation, was not

14

operating for a commercial purpose within the meaning of Act 250. Laberge's range, consisting of a farm field with several benches and earthen berms, is not operating for a commercial purpose any more than a backyard corn maze or community garden space offered to the public free of charge. Act 250 sought to protect Vermont's unique environmental and cultural heritage at a time when the rapid proliferation of large-scale developments was dramatically altering many landscapes and communities around the nation. The text and spirit of Act 250, consistent with our prior decisions, informs our conclusion that the Act was not intended to apply to a family dairy farm that allows the community to target practice on its fields free of charge. For these reasons, we affirm.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 37.  **ROBINSON, J.**, **dissenting.**  The majority has concluded that a facility that is open seven days a week, for ten to eleven hours per day, yielding nearly $20,000 per year in donation revenue does not operate for a "commercial purpose" because the revenue is not essential to sustain the enterprise indefinitely. In reaching this conclusion, the majority attributes to one precedent, In re Baptist Fellowship of Randolph, Inc., 144 Vt. 636, 481 A.2d 1274 (1984), a holding that decision does not espouse; ignores or explains away the reasoning reflected in another more recent precedent, In re Spring Brook Farm Found. Inc., 164 Vt. 282, 671 A.2d 315 (1995); and relies on a policy analysis that doesn't make sense in light of the purposes of the statute we are construing. For these reasons, and because I believe the new rule articulated by the majority will have unfortunate ramifications inconsistent with the Legislature's intent, I respectfully dissent.

15

¶ 38.    Baptist Fellowship clearly establishes that voluntary donations, not required as a condition of use, can give rise to a commercial purpose, but does not support the majority's conclusion that voluntary donations to an entity only support a finding that it has a "commercial purpose" when those donations are essential to financially sustain the entity.

¶ 39.    In Baptist Fellowship, this Court rejected the argument that an entity funded by voluntary contributions does not meet the definition of "commercial purpose." 144 Vt. at 639, 481 A.2d at 1276. The church argued that because a "commercial purpose" is defined by the applicable regulations as "the provision of facilities, goods or services by a person . . . to others in exchange for payment of a purchase price, fee, contribution, donation or other object having value," an entity that does not charge its patrons for services, but instead relies on voluntary contributions, does not have a commercial purpose. Id. at 638, 481 A.2d at 1275 (quotation omitted). We noted that the church's construction "impermissibly render[s] the terms 'contribution' and 'donation' superfluous," since, by definition, donations are voluntary transfers without consideration. Id. at 639, 481 A.2d at 1276. Accordingly, we held that voluntary contributions that were effectively in exchange for facilities or services satisfied the "commercial purpose" definition. Id.

¶ 40.    This Court did not, in Baptist Fellowship, adopt a requirement that the donations be necessary to sustain the church. We quoted the trial court's conclusion that "[w]hile there is no quid pro quo exchange involved, it is clear that the Church could not provide the facilities and services to its members unless it received the contributions and donations from its members" and then summarized, "In other words, there is a de facto exchange of the Church's facilities and services for donations and contributions." Id. We concluded, "This de facto interpretation of the 'in exchange for' wording of Rule 2(L) appears to us to be in keeping with both the purpose and spirit of Act 250." Id. The conclusion this Court embraced was that an implicit exchange of value, resting on voluntary donations rather than assessed charges, met the "commercial purpose"

definition. Nothing in the court's reasoning supports the inference that the fact that the church relied on the donations for its continued survival was necessary to its holding.

¶ 41. In fact, the Court's discussion of the purpose of Act 250 is at odds with the suggestion that the church's reliance on the donations was essential to a determination that it had a "commercial purpose." Had the church held a sufficiently robust endowment to fund its operations in perpetuity, its receipt of donations would still have signaled a commercial purpose, triggering Act 250 jurisdiction. As the Court noted, "Act 250 speaks to land use and not to the particular institutional activity associated with that land use; to exclude a church from the provisions of Act 250 simply because of its evangelical services could not be justified on environmental grounds." Id. Likewise, to exclude a church that receives donations as an implicit exchange for its services and facilities when the church does not require those donations to support its operations could not be justified on environmental grounds.

¶ 42. This Court's discussion of the "commercial purpose" definition in Spring Brook Farm reinforces that it is the contribution of substantial value in exchange for services, not the reliance of the recipient on the contributions to sustain its operations, that satisfies the "commercial purpose" prong. In Spring Brook Farm, a not-for-profit foundation dedicated to providing inner-city children with the opportunity to visit a working farm sought to build a residence hall to house children and their teachers. A philanthropic family provided the initial funding for the project, although the intent was to solicit charitable donations from the general public and business community to enable the project to become self-supporting. The foundation would not accept payments or funds from the students, parents, or schools involved in the program. The narrow holding of the case was "that the exchange element of the commercial purpose test for determining Act 250 jurisdiction incorporates projects where a third person pays the provider of the facility goods or services for the benefit of another." Spring Brook Farm, 164 Vt. at 283, 671 A.2d at 316 (citation omitted). The analysis underlying that holding is instructive in that the Court's

17

identification of the specific elements in the definition of "commercial purpose," as well as its discussion of the purpose of the Act and its impact on the Court's understanding of the "commercial purpose" requirement both reinforce that an entity that receives substantial voluntary contributions, essentially in exchange for its services, has a commercial purpose, without regard to whether the entity relies on those contributions for its sustenance.

¶ 43.    In a detailed analysis of the meaning of "commercial purpose," the Court concluded that the plain language of the "commercial purpose" definition in the applicable rule encompasses the following elements:

> (1) The provision of facilities, goods or services, (2) by a person, (3) other than for a municipal or state purpose, (4) to others, (5) in exchange for, (6) payments of a purchase price, fee, contribution, donation or other object having value.

Id. at 286, 671 A.2d at 318.  In parsing the definition at its most granular level, we said nothing suggesting that the contributions of value must be necessary to sustain the entity proposing a development.  In concluding that all of these elements were satisfied, the Court said nothing about the reliance of the foundation on donations to support the endeavor; instead, we simply noted, "The classroom/residence hall is provided by the Foundation (not for municipal or state purposes) to underprivileged children in exchange for donations and contributions."  Id.  Those were the operative facts that supported the Court's conclusion.

¶ 44.    The majority minimizes the significance of the Court's statutory parsing, suggesting that the decision merely paraphrased the requirements of Rule 2(C)(4)'s definition of "commercial purpose" and otherwise left in place the prior interpretation of the "in exchange for" requirement that the majority attributes to the Baptist Fellowship decision.  Setting aside my disagreement with the majority's read of Baptist Fellowship, it's hard to imagine that if the necessary-to-sustain-the-operations requirement really existed, this Court would not have acknowledged that in the most expansive and detailed consideration of the "commercial purpose"

18

definition it has provided to date. Moreover, there is no indication in Spring Brook Farm that the Court applied this unwritten requirement to the facts in the case; the decision includes no discussion about whether the foundation could or would continue to operate the facility in the absence of the hoped-for public contributions. If this was an essential element of the analysis, the Court would have addressed it, especially given that the hoped-for future contributions to sustain the enterprise were only aspirational at the time.

¶ 45. The Court's discussion in Spring Brook Farm of the purposes of Act 250, and its response to the suggestion that its application of the "commercial purpose" definition improperly expands Act 250 jurisdiction, reinforces this conclusion. I quote it at length because it is germane to the issues in this case:

> The term "commercial," however, can have many different meanings depending on the context in which it is used. In deciding Act 250 jurisdiction, we must view the term "commercial purpose" within the context of a land use statute, not as a tax statute or trade regulation. Viewing the language of Rule 2(L) in this context, "commercial purpose" refers to land use by multiple parties as a result of the developer's provision of facilities, goods or services. We are bound by the language of that definition as adopted by the Board and ratified by the Legislature, not by a general concept of a commercial purpose. Having followed the language of the definition within the spirit of a land use statute, we have not expanded the jurisdiction beyond the intent of the Legislature. Moreover, our holding does not empty the term "commercial" of any content in this context. A distinction remains, for example, between nonprofit commercial development and development for personal residential or recreational use.

> The Foundation's arguments fail to consider the context of the case—jurisdiction for land use permits. The Foundation would treat a project funded by a wealthy philanthropist who does not directly benefit from the project differently from the same project funded by the people who use that project. While such distinctions may be critical for tax purposes or trade regulation, they are irrelevant in the context of a land use statute. The environmental impacts of a dormitory funded by third parties are exactly the same as the impacts of a dormitory funded by the people who use that dormitory. If, instead of building a residence hall for underprivileged children, the Foundation proposed building an incinerator or a factory for agricultural research, Act 250 jurisdiction would undoubtedly be

> less controversial. While we applaud the ultimate purpose of the Foundation's mission, we refuse to rely on inappropriate distinctions to create exceptions to Act 250 jurisdictional requirements.

Id. at 288-89, 671 A.2d at 319-20 (citations omitted).

¶ 46. Much of the above discussion is illuminating in this case: the Court's insistence that the focus is on the impacts of the development, and not on the balance sheet of the entity doing the development; our recognition that the concept of "commercial purpose" from a tax or financial perspective may be different from a land-use perspective; our conclusion that the Legislature intended "commercial purpose" to relate to "land use by multiple parties as a result of the developer's provision of facilities, goods or services"; and the recognition that a worthy and even generous use of land is not inconsistent with a "commercial purpose" for Act 250 purposes. These observations all reinforce the district commission's and Natural Resources Board's determinations in this case. The majority ignores or dismisses this discussion, citing the dissent in Spring Brook Farm as evidence that "[a]lternative understandings of the commercial purpose requirement's function . . . abound." Ante, ¶ 32. But this discussion reinforces and sheds light on the Court's holding in Spring Brook Farm—a holding that, for the reasons noted above, is inconsistent with the majority's position here.

¶ 47. Finally, both the goals of Act 250 and sound policy considerations weigh against the majority's position, and in favor of maintaining the Spring Brook Farm rule. The majority is correct that Act 250 does not purport to apply to all development across the board, but instead seeks to draw a line between that development that requires review and a permit, and that development that remains unregulated by that law. I don't take issue with that reality. But the balance the majority seeks to strike is hard to square with the purpose (or various purposes) of the statute; it shifts the focus from the nature of a developer's operations to its internal finances, rests on a distinction that has no bearing on the regulatory goals of Act 250, leads to incongruous results,

20

and minimizes the relevance of the amounts of the contributions paid in connection with the use of a facility. The Spring Brook Farm assessment, which considers whether the developer receives substantial value in exchange for its goods, services, or facilities, better aligns with the goals of Act 250 and reasonable policy.

¶ 48. Because it posits that the applicability of Act 250 hinges on the extent to which an entity relies on voluntary contributions for its sustenance, the majority's approach requires intrusive and irrelevant exploration of an entity's internal finances, shifting the focus away from the environmental impacts of the activity. Whether an entity that makes its facilities available to the public in implicit exchange for voluntary contributions (by someone—not necessarily the direct beneficiaries) is financially dependent on those contributions has little to no bearing on any relevant consideration for Act 250 purposes. Yet the majority's approach makes discovery and litigation about such an entity's internal finances inevitable, despite its irrelevance to the goals of Act 250.

¶ 49. This kind of inquiry will inevitably lead to incongruous results. A property owner offering use of facilities to the public in implicit exchange for voluntary contributions whose operations entail low overhead costs, or who is independently wealthy, is likely to fall outside the "commercial purpose" definition, but one who has higher overhead costs, or who is not as wealthy or philanthropic, will not—even if the activities are essentially the same. I realize that any line will lead to some outcomes that are hard to square; if Laberge in this case stopped accepting donations the impacts of public use of the facilities would not diminish and might even rise. But it makes little sense that, in the context of significant revenue-generating activities, the application of the "commercial purpose" label depends on the balance sheet, wealth, or generosity of the operator.

¶ 50. Perhaps most importantly, the majority's analysis renders the amount of the revenues an enterprise derives from its facilities, goods, or services, to a minimally relevant factor.

In this case, Laberge is benefitting financially from the public use of the range to the tune of nearly $20,000 per year in voluntary contributions. Laberge accounts for these revenues, and generally uses them to help defray the costs associated with the range—including the property taxes and insurance on the property that would apply regardless of the presence of the range. This is unquestionably a substantial net benefit to Laberge. Whether the "commercial purpose" requirement in Act 250 is designed to target activity perceived to be more impactful, or whether it's designed to distinguish personal use from use that is for-profit, revenues of this level clearly implicate the concerns underlying the "commercial purpose" requirement.

¶ 51. A rule that confers Act 250 jurisdiction when a would-be developer realizes substantial value in exchange for providing goods, services, or facilities, the activity constitutes a "commercial purpose"—the rule I believe we articulated clearly in Spring Brook Farm—is not perfect, but it is much more defensible from the perspective of the purposes of Act 250 and simple logic. Because I conclude that in this case Laberge did receive substantial value in exchange for public access to the shooting range, I would remand for determination of whether the neighbors can establish the requisite development to trigger Act 250 jurisdiction.

¶ 52. I am authorized to state that Chief Justice Reiber joins this dissent.

_____
Associate Justice

22